337 So.2d 441 (1976)
STATE of Louisiana
v.
Kenneth KINNEMANN and Paul Sahuque.
No. 57581.
Supreme Court of Louisiana.
September 13, 1976.
*442 Robert Glass, New Orleans, for defendants-appellants.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Joseph B. Tosterud, Jr., Asst. Dist. Atty., for plaintiff-appellee.
DIXON, Justice.
Defendants were convicted of possession of marijuana and fined $250.00 plus costs, given a four months suspended jail sentence and placed on one year probation. Assigned as error is the court's ruling on the motion to suppress. (See Rule 1, § 11, Louisiana Supreme Court Rules).
At fifteen minutes before 6:00 p.m. on January 6, 1975 three New Orleans policemen parked their vehicle about one-half block from 1620 Dante Street and began to watch the house. One of the police witnesses had been told by a "confidential and reliable informant" on that day that one "Favalora was selling pounds of marijuana and also cocaine from his residence located at 1620 Dante Street," and that the informer had been the contraband in the house.
At about 6:00 p.m. an automobile parked across the street from the house and defendant Sahuque left the other two occupants of the car and entered the building. Fifteen minutes later he reappeared on the front porch with two paper bags in handone a purple "K & B" bag. The bags are not in evidence and not further described in the testimony. Nor is there further description of 1920 Dante; whether it is a single or multiple family residence does not appear.
When the automobile, occupied by the two defendants and driven by a female companion, left 1620 Dante Street, the police followed it, stopping it in the 2700 block of South Carrollton by using their flashing blue light and siren. When they stopped, the police left their vehicle and had the occupants of the other car alight and walk to its rear. One of the policemen looked into the stopped car with a flashlight and announced that he found some marijuana. (That officer testified that he saw an open paper sack on the backseat with green vegetable material exposed). The occupants of the car were immediately told that they were under arrest, and the officer then entered the car and retrieved the contraband.
The testimony at the motion to suppress is substantially conflicting. The facts here related are taken from the police testimony. In addition to the mere presence of defendants at 1920 Dante Street, the State argues that Sahuque arrived empty-handed, left with two paper sacks, looked up and down before crossing the street, and that his demeanor on leaving differed from that on entering the house.
Information possessed by the police, as related at the trial, would have adequately supported a search warrant for 1620 Dante Street. See Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 85 S.Ct. 584, 21 L.Ed.2d 637 (1969). Our question is whether all the information within the knowledge of the police justified the arrest of the visitor to 1620 Dante Street, or whether the arrest was made on suspicion.
In February of 1975 we decided State v. Jones, La., 308 So.2d 790, a case in which the facts were similar, except that the setting was rural instead of urban. The police had information that a house about ten miles from Natchitoches contained large quantities of marijuana, and were observing the house and activities around it by driving past. They had seen different cars come and go, and on one pass saw the car in *443 which Jones was riding parked at the house. A few minutes later they saw the car leaving and followed it. The car was later stopped and the occupants were arrested. A search of Jones at the police station disclosed marijuana gleanings which were the basis of the prosecution. We held that the police did not possess sufficient knowledge to justify stopping the Jones vehicle, and the contraband detected as a result of that stop should have been suppressed.
In November, 1974 we had decided State v. Saia, La., 302 So.2d 869. There, officers saw Saia leave a residence known to them to be a drug outlet. They sprang from their car and attempted to seize her, during which effort she exposed a packet like those which contain narcotics. The State argued that C.Cr.P. 215.1[1] authorized them to stop Saia and question her. We held that, properly interpreted, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Sibron and Peters v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) did not prohibit the police from approaching a person to investigate suspicious circumstances, and permitted "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889.
We further held in Saia that Terry, Sibron, Peters and Adams did not permit, in the absence of probable cause, the warrantless search of another except for the protection of the investigating officer. The "stop and frisk" law of the State of New York, as well as C.Cr.P. 215.1 of the State of Louisiana, with the necessary exception of the right of the police to protect themselves, "must be judged under the Reasonable Search and Seizure Clause of the Fourth Amendment." Sibron and Peters v. New York, 392 U.S. 40, 62, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917.
Again, in July of 1975 we held that a search of the person could not be justified by C.Cr.P. 215.1 without at least a reasonable connection between criminal conduct (law violation) and such suspicious activity as startled looks and changing course to avoid police. State v. Truss, La., 317 So.2d 177.
The Louisiana Constitution counterpart of the Fourth Amendment of the United States Constitution is Article 1, § 5 of the Louisiana Constitution of 1974:
"Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court."
Should there be any doubt that the right of the police to forcefully stop and search others is circumscribed by the Fourth Amendment of the United States Constitution, there can be none that the Louisiana Constitution of 1974, by the inclusion of the words "invasions of privacy" meant to extend the "probable cause" requirement *444 to protect that right, as well as the right to be secure against unreasonable searches and seizures. It can hardly be argued that the right of privacy protected by Article 1, § 5 of the Louisiana Constitution of 1974 does not include at least that right discussed by Justice Brandeis in his dissent to a case which permitted the use of wire tap evidence:
"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness . . . They conferred, as against the government, the right to be let alonethe most comprehensive of rights and the right most valued by civilized men." Dissent, Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928).
Therefore, it should make no difference in Louisiana whether the actions of the police constituted an "arrest," with the discovery of the contraband an incident thereto, or whether the police action was something less than an arrest, during which the contraband was seen "in plain view." In either case the police action must have been reasonable, that is, supported by probable cause.
Nevertheless, it would be difficult to describe the action of the police in this case as anything but an arrest. They meant to apprehend Sahuque and his companions. They delayed the apprehension until defendants had left the neighborhood of the house under observation. They hoped to find contraband to reinforce an application for a search warrant for 1620 Dante Street.
The police stopped defendants with blue lights and siren. Three officers removed the occupantsone on the driver's side and two on the passengers'. One officer testified that, in his opinion, he had probable cause to arrest Sahuque when he left the premises at Dante Street. While one officer searched into the car, the others were in the process of obtaining identification from defendants.
The police did not approach the vehicle to talk to Sahuque about his presence at Favalora's, nor were they looking into the car for weapons. The defendants were "actually restrained" before the contraband was found. The Code of Criminal Procedure, Article 201, defines arrest:
"Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him."
The defendants were arrested. Unless the arrest was for probable cause, it was not a lawful arrest.
The State does not argue that there is probable cause to search every person entering and leaving a building where a "reliable confidential informant" says marijuana is being sold. The only information the police had, in addition to the simple presence of defendants, was that Sahuque entered 1620 Dante Street empty-handed, left with two paper bags, looked up and down the street and had lost his "carefree demeanor" when he left.
These "facts" cannot be said to furnish probable cause for an arrest or search. They do not connect defendants with criminal activity. They are at least as consistent with innocent activity as with guilt. All kinds of people go in and out of all buildings. Paper sacks are not peculiar to narcotics traffic; rather, they are almost exclusively related to innocent uses. One would more reasonably expect an attempt to conceal the container of marijuana. People should be encouraged to look up and down the street. Sahuque's "changed demeanor" is not even described as "furtive" by the policeonly changed.
Justice Rutledge's explanation of probable cause, in Brinegar v. United States, 338 U.S. 160, 175-177, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, is often quoted:
"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly *445 correlative to what must be proved.
"`The substance of all the definitions' of probable cause `is a reasonable ground for belief of guilt.' McCarthy v. DeArmit, 99 Pa. 63, 69, quoted with approval in the Carroll opinion. 267 U.S. at page 161, 45 S.Ct. at page 288, 69 L.Ed. 543, 39 A.L.R. 790. And this `means less than evidence which would justify condemnation' or conviction, as Marshall, C. J., said for the Court more than a century ago in Locke v. United States, 7 Cranch 339, 348, 3 L.Ed. 364. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where `the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790.
"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.
"The troublesome line posed by the facts in the Carroll case and this case is one between mere suspicion and probable cause. That line necessarily must be drawn by an act of judgment formed in the light of the particular situation and with account taken of all the circumstances. No problem of searching the home or any other place of privacy was presented either in Carroll or here. Both cases involve freedom to use public highways in swiftly moving vehicles for dealing in contraband, and to be unmolested by investigation and search in those movements. In such a case the citizen who has given no good cause for believing he is engaged in that sort of activity is entitled to proceed on his way without interference. But one who recently and repeatedly has given substantial ground for believing that he is engaging in the forbidden transportation in the area of his usual operations has no such immunity, if the officer who intercepts him in that region knows that fact at the time he makes the interception and the circumstances under which it is made are not such as to indicate the suspect is going about legitimate affairs.
"This does not mean, as seems to be assumed, that every traveler along the public highways may be stopped and searched at the officers' whim, caprice or mere suspicion. The question presented in the Carroll case lay on the border between suspicion and probable cause. But the Court carefully considered that problem and resolved it by concluding that the facts within the officers' knowledge when they intercepted the Carroll defendants amounted to more than mere suspicion and constituted probable cause for their action. . . ."
Brinegar was convicted of illegal interstate transportation of liquor from Missouri to Oklahoma. Agents who knew Brinegar and his reputation as a liquor hauler, had seen him loading liquor in Missouri, knew and recognized his car, which appeared to be heavily loaded, spotted Brinegar about five miles from the border in Oklahoma, and stopped him discovering the illegal liquor. Today we would have no trouble finding probable cause for the stop cf. State v. McQueen, La., 278 So.2d 114 (1973). In 1949, the majority found probable cause *446 with some apparent difficulty; Justice Burton concurred; Justices Murphy, Jackson and Frankfurter dissented.
If the police in the case before us had known Sahuque and his companions like the Alcohol Tax Agents knew Brinegar, there would be probable cause for stopping Sahuque. Reasonable officers would have been suspicious of Sahuque: they did not, however, possess facts and circumstances justifying a belief in Sahuque's guilt. The actions of this person, a stranger to the police, were more consistent with innocence than with guilt. Unless the after-the-stop discovery of the contraband clouds our judgment, we must find that the reasonable probabilities when Sahuque emerged from 1620 Dante Street weighed more heavily on the side of innocence than of guilt.
The motion to suppress should have been sustained.
For these reasons, the convictions and sentences are reversed and the case is remanded for further proceedings not inconsistent with this opinion.
SANDERS, C. J., and MARCUS, J., dissent.
NOTES
[1] "A. A law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or a misdemeanor and may demand of him his name, address and an explanation of his actions.

"B. When a law enforcement officer has stopped a person for questioning pursuant to this Article, and reasonably suspects that he is in danger of life or limb, he may search the outer clothing of such person for a dangerous weapon or for any other thing the possession of which may constitute a crime.
"C. If the law enforcement officer finds a dangerous weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.