346 So.2d 657 (1977)
STATE of Louisiana
v.
Henry C. SHIVERS.
No. 59080.
Supreme Court of Louisiana.
May 16, 1977.
Concurring Opinion June 13, 1977.
*658 Daryl Gold, Simms & Gold, Leesville, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John A. Richardson, Dist. Atty., B. Woodrow Nesbitt, Jr., Asst. Dist. Atty., for plaintiff-appellee.
SANDERS, Chief Justice.
The State charged Henry Shivers with possession of heroin with the intent to distribute in violation of LSA-R.S. 40:966. After a trial, the jury found defendant guilty as charged. The court sentenced defendant to life imprisonment. He appeals his conviction and sentence, relying upon two assignments of error. Finding reversible error in his first assignment of error, it is unnecessary that we consider his second assignment.
In his first assignment of error, defendant correctly maintains that the trial court erred in denying his motion to suppress the heroin. The facts surrounding the seizure of the evidence which is the basis of his motion are:
On December 10, 1975, at approximately noon, Agent Jack Miller met with a proven confidential informant and arranged for the informant to make a heroin purchase from Junior[1] Porter, a suspected marijuana and heroin dealer, at Porter's house located at 4108 Mayfield Street in Shreveport. Agent Miller requested Agent Sam Bolen's assistance in establishing surveillance of the informant's activities relative to the narcotics transaction.
At approximately 8:00 that evening, Agent Miller searched the informant and finding no narcotics on his person, gave him fifty dollars with which to make the purchase. Agents Miller and Bolen positioned themselves separately at locations near Mayfield Street and maintained radio contact. Agent Miller saw his confidential informant drive up in front of 4108 Mayfield, park his car, and exit his vehicle according to prearranged plans. Miller, however, could not see the informant enter 4108 Mayfield from his vantage point. A short time thereafter, Miller saw the informant return to his car and drive away. Agent Miller immediately drove to the prearranged meeting place and met with his informant, who told him that he had made the buy from Junior[2] Porter at 4108 Mayfield. Miller radioed Agent Bolen, who was still at his surveillance location and informed him that "a purchase had gone down at the third house west of Broadway on Mayfield." Agent Bolen was not located where he could witness the activities of the informant. Agent Miller ran a field test on the substance believed to be heroin which his informant had purchased from 4108 Mayfield in a one cent party balloon. The test proved the presence of heroin in the substance. When Agent Miller tried to radio Bolen that the substance purchased was indeed heroin, he was unable to make radio contact because Bolen was in the process of stopping a vehicle. Agent Bolen stopped the vehicle after witnessing the following occurrences:[3]
*659 With the knowledge that Agent Miller's informant had purchased a substance thought to be heroin from the third house west of Broadway on Mayfield, Bolen saw a black car stop in front of the third house from the corner. Two men exited the vehicle and entered the third house from the corner on the north side of Mayfield. They remained inside only a short time and then returned to their car. A brown car also pulled up and a man exited and entered the third house from the corner on the other side of Mayfield, directly across the street from the house which the other two men had entered and exited. The man quickly returned to his car and drove away in the direction of Agent Bolen, who was positioned inside a 1972 red Ford vehicle with three antenaes, a somewhat conspicuous, although unmarked, police unit. The brown car turned on its left turn signal indicator but did not make the left turn and instead turned off the blinker and proceeded directly ahead to a position approximately thirty feet from Bolen's vehicle and turned on its bright lights and slowed to a stop. It then immediately proceeded onward and turned at the next corner and returned to its previous location in front of 4108 Mayfield. The driver of the brown vehicle had a short conversation with the men in the black car and then both vehicles drove away. Agent Bolen radioed other police to stop the brown vehicle and radioed Agent Miller to assist him in stopping the black vehicle. Agent Bolen, through the use of siren and red flashing police lights, pulled the black car over. Miller drove to the scene as the black car was coming to a stop.
Bolen asked the men to get out of the car and come to the rear of the vehicle with their hands where he could see them. He stated that he had "reasonable grounds to believe the vehicle contained narcotics." Henry Shivers, the driver, and Claude King, his passenger in the front seat, exited the car in compliance with the officer's orders. Agent Bolen asked Miller to "take custody" and Miller "patted down" the two men. Once they exited the car and presented identification, Bolen recognized Shivers, by name, and Claude King, by sight, as persons suspected of being involved in narcotics.
Agent Bolen looked into the automobile and finding a thirteen-year-old boy in the back seat, ordered him out. Bolen then began a search of the car. He found a syringe and needle under the edge of the passenger's side of the front seat and a paper bag containing "one cent" balloons (the usual packaging for heroin in that area) on the front seat of the vehicle. After his find, Agent Bolen walked to the rear of the car and asked Agent Miller if he had searched the individuals. Miller told him that he had only patted them down for weapons. Bolen then began walking to the car to continue his search of the vehicle, when he stopped and reached into thirteen-year-old Anthony Shiver's left pocket. Finding nothing, he then reached into the boy's right pocket and found a tin foil packet containing a substance, which when tested proved to be heroin.
The Fourth Amendment to the United States Constitution provides:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
Article 1, § 5 of the Louisiana Constitution of 1974 also provides:
"Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have *660 standing to raise its illegality in the appropriate court."
The right of law enforcement officers to stop, interrogate, and frisk one reasonably suspected of criminal conduct is recognized by LSA-Code of Criminal Procedure Article 215.1, which provides:
"A. A law enforcement officer may stop any person in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or a misdemeanor and may demand of him his name, address and an explanation of his actions.
"B. When a law enforcement officer has stopped a person for questioning pursuant to this Article, and reasonably suspects that he is in danger of life or limb, he may search the outer clothing of such person for a dangerous weapon or for any other thing the possession of which may constitute a crime.
"C. If the law enforcement officer finds a dangerous weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person."
The right to stop and frisk is equally well recognized in the jurisprudence, both federal and state. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Dixon, La., 337 So.2d 1165 (1976); State v. Cook, La., 332 So.2d 760 (1976); State v. Perique, La., 340 So.2d 1369 (1976); State v. Rogers, La., 324 So.2d 403 (1975); State v. Jefferson, La., 284 So.2d 882 (1973).
The right to make an investigatory stop and question the individual detained must be based upon reasonable suspicion that he has been, is, or is about to be engaged in criminal conduct. State v. Cook, supra; State v. Winesberry, 256 La. 523, 237 So.2d 364 (1970). When such a stop is made, the officer may question the person concerning his identity and actions. If the officer reasonably suspects that he or another is in danger, he may also for protection conduct a limited search of the outer clothing of such person. The limited search is often referred to as a frisk. Normally, a frisk is a pat-down of the outer surfaces of a suspect's clothing. It represents a minimal intrusion upon personal privacy.
In the instant case, Agent Bolen, the officer who actually stopped defendant's vehicle by signalling the red police lights and siren, was acting upon the following information:
The Porter brothers, reputed narcotics dealers, were under surveillance. They resided on opposite sides of Mayfield Street from each other; both resided in the third house from the corner of Broadway. A confidential informant had made a buy of what the officers believed to be heroin from one of the two Porter residences. The two men in Shiver's black automobile had entered and exited quickly from one of the Porter residences, and had conversed with the driver of a brown car, who Agent Bolen believed had recognized him as an undercover narcotics officer.
With this knowledge Agent Bolen stopped the vehicle in which the two men were riding. He radioed other police to stop the other vehicle. After stopping Shiver's vehicle and being presented identification, Agent Bolen recognized Claude King, on sight, and Henry Shivers, by name, as persons involved in drug violations. He then searched the vehicle, wherein he found narcotics paraphernalia which motivated him to search the pockets of young Anthony Shivers for narcotics.
In our opinion, the totality of the circumstances was such as to give rise to a reasonable suspicion that the occupants of the vehicle were engaged in narcotics offenses. Hence, the officers had the right to stop the vehicle under Article 215.1 of the Louisiana Code of Criminal Procedure.
Under the stop and frisk statute, the officers were authorized to question the men about their presence at the known drug outlet, and if they reasonably suspected danger, to frisk the outer garments of the occupants. However, under the statute, the officers were not authorized to search *661 the vehicle. There is no evidence that the syringe and needle found under the passenger side of the front seat, nor the bag of balloons found on the front seat were in plain view. Consequently, we conclude that the seizure of these items was unconstitutional.
After Agent Bolen found the materials in the car, he returned to the rear of the car and asked Agent Miller if he had searched the individuals. He answered that he had patted them down.
After the unproductive frisk, Agent Bolen was unauthorized to make a search of Anthony Shiver's person for narcotics and seize the packet of heroin in his pocket. Bolen testified that after finding the syringe and balloons, he was sure that the boy had the heroin because he was just "too quiet." As we have noted, however, the syringe and balloons were seized in an unconstitutional search. Hence, they cannot supply probable cause for a search of the person. Any evidence produced as a result of an illegal search and seizure is tainted and thus inadmissible under the fruit of the poisonous tree doctrine. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Silverthorne v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).
We conclude that although Agent Bolen was legally entitled to make the investigative stop of defendant, he exceeded his statutory and constitutional authority in searching defendant's vehicle, as a result of which he ultimately obtained the evidence which is the subject of defendant's motion to suppress. Therefore, we hold that the trial court erred in denying defendant's motion to suppress.
For the reasons assigned, the conviction and sentence are reversed, and the case is remanded for a new trial.
DIXON, J., concurs with reasons.
CALOGERO, J., concurs and assigns reasons.
DENNIS, J., concurs and assigns reasons.
SUMMERS, J., dissents.
DIXON, Justice (concurring).
While I agree with the result reached by the majority, I respectfully disagree with the reasons used to support the conclusion. It is unnecessary to determine whether or not Agent Bolen was authorized to search the vehicle. The stop of the car and its passengers was not supported by probable cause and therefore could not form the basis for a subsequent valid search and seizure. The Fourth Amendment to the United States Constitution and Article 1 § 5 of the Louisiana Constitution are the basis for an essential requirement of a free country: no one may be subject to a search or seizure without probable cause.
As the majority appears to concede, the "stop" of defendant's vehicle was not supported by probable cause. Rather, the action of the police is sought to be sought to be justified as a lawful "stop and frisk" pursuant to C.Cr.P. 215.1 (reproduced in the majority opinion). In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court delineated the underlying principles to be applied in these cases:
"If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether `probable cause' existed to justify the search and seizure which took place. However, that is not the case. We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure,. . . (citations omitted). But we deal here with an entire rubric of police conductnecessarily swift action predicated upon the on-the-spot observations of the officer on the beatwhich historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.

"Nonetheless, the notions which underlie both the warrant procedure and the requirement of probable cause remain fully *662 relevant in this context." 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. (Emphasis added).
It is clear that the Fourth Amendment is the standard against which the police conducted must be judged. Since the facts known to Agent Bolen did not reach the level of probable cause, the stop of defendant's car was unauthorized and therefore nothing seized pursuant to that stop was admissible.[1]
There is no meaningful distinction between the terms "stop and frisk" and "arrest (seizure of the person) and search," except as a matter of degree. The Supreme Court, in Terry v. Ohio, supra, recognized the danger of classifying police conduct according to this terminology:
"Our first task is to establish at what point in this encounter the Fourth Amendment becomes relevant. That is, we must decide whether and when Officer McFadden `seized' Terry and whether and when he conducted a `search.' There is some suggestion in the use of such terms as `stop' and `frisk' that such police conduct is outside the purview of the Fourth Amendment because neither action rises to the level of a `search' or `seizure' within the meaning of the Constitution. We emphatically reject this notion. It is quite plain that the Fourth Amendment governs `seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime`arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has `seized' that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a `search.' Moreover, it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a `petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." 392 U.S. *663 at 16-17, 88 S.Ct. at 1877, 20 L.Ed. at 903. (Emphasis added).
"The distinctions of classical `stop-and-frisk' theory thus serve to divert attention from the central inquiry under the Fourth Amendmentthe reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security. `Search' and `seizure' are not talismans. We therefore reject the notions that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a `technical arrest' or a `full-blown search.'" 392 U.S. at 19, 88 S.Ct. at 1878-79, 20 L.Ed.2d at 904. (Emphasis added).
In one of the companion cases to Terry, Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Supreme Court (through the same author) said:
"Section 180-a, unlike § 813-a, deals with the substantive validity of certain types of seizures and searches without warrants. It purports to authorize police officers to `stop' people, `demand' explanations of them and `search [them] for dangerous weapon[s]' in certain circumstances upon `reasonable suspicion' that they are engaged in criminal activity and that they represent a danger to the policeman. The operative categories of § 180-a are not the categories of the Fourth Amendment, and they are susceptible of a wide variety of interpretations. New York is, of course, free to develop its own law of search and seizure to meet the needs of local law enforcement, see Ker v. State of California, 374 U.S. 23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963), and in the process it may call the standards it employs by any names it may choose. It may not, however, authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct. The question in this Court upon review of a state-approved search or seizure `is not whether the search [or seizure] was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment. Just as a search authorized by state law may be an unreasonable one under that amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.' Cooper v. State of California, 386 U.S. 58, 61, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967)." 392 U.S. at 60-61, 88 S.Ct. at 1901-02, 20 L.Ed.2d at 933-34. (Emphasis added).
Whether the procedure that was employed in this case is termed a "stop," an "investigatory stop" or a "temporary detention," when Agent Bolen pulled the defendant's car over, ordered the passengers out and to the back of the car and told Agent Miller to "take custody" of the occupants, the defendant was under arrest. C.Cr.P. 201 defines arrest as follows:
"Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him."
See State v. Kinnemann, supra.
Unless the arrest was for probable cause, it was not lawful. Neither the majority nor the State contend that probable cause to arrest existed at the time that the defendant's vehicle was stopped. Therefore, any evidence seized pursuant to the unlawful arrest was inadmissible.
CALOGERO, Justice, concurring.
Although I believe that the majority correctly reverses the accused's conviction, I concur in the decision for the reasons stated by Mr. Justice Dixon, and because I believe that the majority wrongly states in footnote three that we should examine both the evidence taken at the trial of the case as well as the evidence taken at the suppression hearing when we review the correctness of the trial judge's ruling on a motion to suppress.
DENNIS, Justice, concurring.
I concur in the decision for the reasons stated by Justices DIXON and CALOGERO.
NOTES
[1] At the hearing on the motion to suppress, Agent Miller testified that the confidential informant made the heroin purchase at 4108 Mayfield, the home of Clyde Porter. At the trial on the merits, he testified that he was confused at the hearing on the motion to suppress and that the informant made the heroin purchase at Junior Porter's residence, 4108 Mayfield. See footnote 3.
[2] See footnote nos. 1 and 3.
[3] In determining whether the ruling on the motion to suppress was correct, we are not limited to the evidence adduced at the trial of the motion. We may consider all pertinent evidence given at the trial of the case. State v. Smith, 257 La. 1109, 245 So.2d 327 (1971); State v. Andrus, 250 La. 765, 199 So.2d 867 (1967); In accord: People v. Braden, 34 Ill.2d 516, 216 N.E.2d 808 (1966); Commonwealth v. Young, 349 Mass. 175, 206 N.E.2d 694 (1965).
[1] It should be noted that even if the analysis employed by the majority is used, Agent Bolen did not have sufficient grounds to "reasonably suspect" that the defendant was committing, had committed or was about to commit a crime. C.Cr.P. 215.1. Taking the facts known to the agent as described in the majority opinion, the activity of the occupants of the defendant's car is as consistent with purely innocent behavior as with suspected criminal activity. Although the defendant and another individual entered a house on Mayfield Street where the confidential informant "may" have purchased heroin, and that house was the residence of either Junior or Clyde Porter ("reputed" narcotic dealers), the two men left the house carrying nothing. At this time Agent Bolen did not even know who these two men were. Subsequently, the driver of a brown automobile (whom Agent Bolen suspected had identified his vehicle as a police unit) spoke with the men in the black car and then both cars drove off. At this point Agent Bolen pulled the defendant's car over. Only after the occupants left the car (according to Agent Bolen's instructions) was Agent Bolen able to identify the occupants. The circumstances surrounding this stop are analogous to those in State v. Saia, 302 So.2d 869 (La.1974), when this court found that the seizure of the defendant could not be justified as a "stop" under C.Cr.P. 215.1. See also, Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

In State v. Kinnemann, 337 So.2d 441 (La. 1976), two police officers received information from a confidential informant that an individual was selling pounds of marijuana and cocaine from a specific residence on Dante Street and that the informant had seen the contraband in the house. The officers staked out the premises and saw one of the defendants enter the house, to reappear fifteen minutes later, with two paper bags. The defendant then re-entered his car and drove off. The police followed the car for a short while and then stopped the vehicle. In that situation, this court held that the actions of the defendant were more consistent with innocence than with guilt (notwithstanding the fact that the defendant, emptyhanded, had entered a residence suspected of being a drug distribution outlet and emerged a short time later with two paper bags) and that the police did not have probable cause to even stop the defendant's vehicle. The facts in Kinnemann are even more indicative of possible guilt than those in the present case, and yet the stop was unauthorized under C.Cr.P. 215.1. Similarly, the facts known to the agent here did not support an "investigatory stop" under C.Cr.P. 215.1.