356 So.2d 956 (1978)
STATE of Louisiana
v.
John DUNBAR and Jason Gordon.
No. 60634.
Supreme Court of Louisiana.
March 6, 1978.
Rehearing Denied April 6, 1978.
*958 Bruce S. Kingsdorf, New Orleans, for Jason Gordon.
Roy A. Raspanti, Chalmette, for John Dunbar.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Brian Meissner, Asst. Dist. Atty., for plaintiff-appellee.
CALOGERO, Justice.
Defendants John Dunbar and Jason Gordon were charged by bill of information with the armed robbery of one Willie Brown (count one) and of one Eldridge Sheppard (count two), both in violation of R.S. 14:64. They pled not guilty and, after trial, the jury returned verdicts of guilty as charged as to both counts for both defendants. Thereafter, both defendants were determined to be multiple offenders; Dunbar was sentenced to forty nine and one-half years at hard labor with credit for time served; defendant Gordon was sentenced to *959 thirty-three years at hard labor with credit for time served. On appeal, defendants rely upon four assignments of error for reversal of their convictions and sentences.

FACTS
On April 28, 1976 between 2:30 and 3:00 p. m., high school students Willie Brown and Eldridge Sheppard were approached by two men around the 3000 block of Thalia Street in New Orleans, approximately two blocks from their school. One of the two men pulled out a gun which was partially wrapped in a purple bandana, took the boys' hats and watches, and demanded their money. The other man exposed a gun in his waistband, also wrapped in a bandana, but never pulled it out. Brown gave them 40 cents in pocket change. As the men commanded, the students began to run in the direction of Claiborne Avenue, while the armed men ran in the opposite direction.
Brown and Sheppard immediately proceeded to the Sixth District Police Station and reported the incident to Officers Leufray and Wilson. They provided the following description of the two men: two black men, aged 20-22 years; one man with a darker complexion, heavier than the other, with plaited hair in rubber hands, wearing green short pants and a green striped shirt; the other with a lighter complexion, a slim build, wearing a bandana around his head. Sheppard stated that he had recognized the slimmer man.
The officers left in their patrol car taking the boys with them, drove first to the location of the incident, and then in the direction the men had run. Upon arrival at the 3300 block of Thalia Street in the Calliope Housing Project (about three blocks from where the robbery had occurred), Officer Wilson saw a man wearing green short pants and a green tank top, who had been sitting on an apartment porch, quickly jump up and run into the building at 3316 Thalia Street, apparently having seen the police car. Brown then identified a hat which was on the porch steps as that taken from him in the robbery. Officer Wilson radioed for back-up units and entered the building from the back. He announced his purpose in investigating an armed robbery to a woman (who was later determined to be defendant Dunbar's mother) at Apartment D and, according to Officer Wilson's testimony at trial, was allowed to enter. The two defendants were found sitting in the living room, one wearing green short pants and a green shirt. As Officer Wilson opened the front door of the apartment to admit another officer, he discovered a loaded revolver outside the apartment door in the hallway of the building. The defendants were advised they were under suspicion for armed robbery, handcuffed, escorted downstairs and identified as the perpetrators of the robbery by the victims, Brown and Sheppard. The defendants were placed under arrest. Following the arrest, the officers seized a purple handkerchief from defendant Dunbar and a second handkerchief from defendant Gordon.[1]
After removing the defendants from the apartment, Officer Wilson returned to Apartment D with two other officers and, according to Wilson, obtained consent to search the apartment. Wilson found a chrome watch wedged in the cushion of a chair where one of the men had been sitting, and another officer located a green striped shirt in the bathroom of the apartment.

ASSIGNMENT OF ERROR NO. 1
Defendants contend, on various grounds, that the trial court erred in denying a motion to suppress evidence obtained pursuant to a warrantless arrest and warrantless search.
Defendants first contend that the police officers' entry into Apartment D of 3316 Thalia Street was unlawful and, therefore, all the evidence seized as a result of that *960 illegality (a green and white striped shirt, a purple handkerchief, a pistol, the chrome watch, and identifications by the victim) must be suppressed.
Article 213(3) of the Code of Criminal Procedure authorizes a warrantless arrest whenever an officer has reasonable cause to believe the person to be arrested has committed an offense. In the instant case, Officer Wilson observed a man fitting a description given by the victims of the robbery spring to his feet from a porch where he had been sitting and race into a four-plex at 3316 Thalia. This occurred within one-half to three-quarters of an hour following the robbery and within three blocks of where the offense was committed. In addition, lying on the steps of the porch where the man had just been sitting was a cap which was positively identified at that time by one of the victims as that taken from him during the robbery.
A warrantless arrest can only be made if it is based on probable cause which exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. See State v. Herbert, 351 So.2d 434 (La.1977) and citations therein. Probable cause to arrest the man existed from the time the officer saw him running. The man's apparent flight from apprehension does not in and of itself indicate guilt, see State v. Herbert, supra; however, combined with the description of the robber, his close proximity to the scene of the offense both in time and location, and the presence of property taken in the robbery, the flight would indicate to a reasonable man that the fleeing man had some involvement with the crime. The policeman's pursuit of defendant into the dwelling was made with probable cause and in "hot pursuit" so that entry into the apartment building without a warrant did not violate state or federal constitutional guarantees. Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); State v. Franklin, 353 So.2d 1315 (La.1978).
Defendants concede that the existence of probable cause and exigent circumstances warranted the officers' entry into the apartment building; they argue, however, that there was no such probable cause for entry specifically into Apartment D where defendants were found. In support of this argument they cite a federal appellate court case, United States v. Scott, 520 F.2d 697 (9th Cir. 1975). In Scott, police officers pursued four black male armed robbers to an apartment building containing approximately twenty units. On the basis of certain information the officers were able to narrow their search to seven suspected apartments and eventually found the defendants in the last-searched apartment. The court affirmed the trial court's denial of a motion to suppress on the basis that the officers had probable cause to believe the men were in the apartment where they were found. The officers had already eliminated the other six suspected apartments and at the seventh the officers knocked for a few minutes, announced their identity, got no response, and heard scuffling noises from the interior. In the course of the opinion the court stated:
"Accepting that pursuit here had brought the officers to the apartment house, this did not render each apartment in it subject to search. The occupants of each apartment had their independent right to be free from unreasonable search. No apartment was subject to entry in the absence of probable cause to believe that the robbers were present in that particular apartment." 520 F.2d at 700.
The testimony at the hearing on the motion to suppress in the case now before us is unclear as to how or exactly when the police officers determined that Apartment D contained the suspect. Officer Wilson testified that the officers "began searching each of the apartments for the fleeing subject" and then went on to state that when they reached Apartment D they entered through the rear and found the two defendants. The testimony does not reveal if certain noises were heard emanating from the *961 apartment or if the other three apartments had already been checked.[2] Therefore, it is not possible to determine with certainty whether the entry into Apartment D was made with probable cause to believe that the suspects were inside that particular apartment. For that reason, we cannot hold that warrantless entry was justified because made with probable cause and in hot pursuit, nor unjustified because made without probable cause. Warden v. Hayden, supra; United States v. Scott, supra.
Instead, we find that entry was legally made on the basis of consent. In that regard, the state argues that entry into Apartment D was initially obtained through the permission of Mrs. Dunbar, John Dunbar's mother. But at the hearing on the motion to suppress, as defendants correctly point out, the state offered no evidence to show that permission to enter was secured. The state responds that the record of the hearing on the motion to suppress is silent on the question of initial entry into the apartment since the issue at that hearing was the later entry, made after defendant's arrest, for the purpose of searching for evidence.
At a motion to suppress hearing, once the defendant makes the initial showing that a warrantless search occurred, the burden of persuasion shifts to the state to affirmatively show that the search is justified under one of the narrow exceptions to the rule requiring a search warrant. State v. Franklin, supra. The state argues that although there was no testimony at the hearing regarding permission to enter the apartment, Officer Wilson testified at trial:
"Upon reaching Apartment D, a black female opened the door there. I advised her we were looking for two subjects possibly wanted for the armed robbery that might be in the building. `Could we possibly check the residence?' The lady responded verbally that we could check the residence, but opened the door fully and we entered."
At trial, Mrs. Dunbar denied that she gave the police permission to enter but rather, "they just barged on by me and came on in." She admitted, however, that the policeman knocked at the door, identified themselves as police officers, and that she opened the door.
This Court has held that we are not limited to the evidence adduced at trial of a motion to suppress in determining the correctness of a ruling on the motion but may consider all pertinent evidence given at the trial of the case. State v. Shivers, 346 So.2d 657 (La.1977); State v. Smith, 257 La. 1109, 245 So.2d 327 (1971); State v. Andrus, 250 La. 765, 199 So.2d 867 (1967).[3] Thus, we will accept the trial testimony of Officer Wilson that Mrs. Dunbar consented to the officers' entry into the apartment. Defendants argue alternatively that if Mrs. Dunbar consented to the search that her agreement was coerced because she was not advised of her right to deny the officers' entry and was intimidated by the police.
Questions of consent are issues of fact, dealing as they do with witness credibility. State v. Temple, 343 So.2d 1024 (La.1977); State v. Bartley, 329 So.2d 431 (La.1976). The determination of the trial judge, who has the opportunity to hear and observe the witnesses, is entitled to great weight on review. State v. Temple, supra. The fact that a person was not warned of his or her right to refuse entry, while a significant factor in determining whether consent was given, is only one factor in determining the voluntary nature of consent. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Temple, supra. Under the circumstances *962 of this case, we cannot say that the trial judge erred in finding that the state had carried its burden of showing that, the entry fell under the exception to the warrant requirement which allows a lawful search without a warrant on proper consent.
Since police entry into the apartment was lawful on the basis of the voluntary consent of a co-inhabitant, denial of the motion to suppress the pistol, the purple handkerchief and the victim identifications was proper. Officer Wilson inadvertently came across the pistol while admitting Officer Leufray through the front door of the apartment. The police officer had a right to be where he was and therefore could seize the incriminating object which was in plain view. See Harris v. U. S., 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); State v. Williams, 349 So.2d 286 (La.1977); State v. Williams, 347 So.2d 231 (La.1977). The handkerchief was properly seized in a search incident to a valid arrest. The victim identifications are not tainted by the warrantless entry, for the entry was not legally impermissible.
The assignment has no merit.

ASSIGNMENT OF ERROR NO. 2 (Dunbar), NO. 3 (Gordon)
Defendants contend that the one-on-one show-up identifications of defendants at the scene of their arrest by the victims was impermissibly suggestive and conducive to misidentification. Thus, they argue, the trial court erred in denying their motion to suppress the out-of-court identifications. They further argue that the in-court identifications made by the victims did not meet criteria to show that those identifications had a source independent of the tainted out-of-court identification and, therefore, should not have been permitted at trial.
The record reveals that the victims were sitting in the back of a police unit in front of 3316 Thalia Street at the time the arrests were effected. The victims were asked if the defendants, now in handcuffs, were the perpetrators. Both boys positively identified defendant Dunbar, and Sheppard positively identified defendant Gordon. The identifications were made from a distance of approximately 25 to 35 feet.
While one-on-one confrontations between a suspect and victim are not favored by the law, identifications made in this matter are permissible when justified by all of the circumstances. State v. Frank, 344 So.2d 1039 (La.1977); State v. Lee, 340 So.2d 1339 (La.1976); State v. Maduell, 326 So.2d 820 (La.1976). In particular, such identifications are permitted when the accused is apprehended within a relatively short period of time after commission of the offense and is returned to the scene of the crime for on-the-spot identification. State v. Collins, 350 So.2d 590 (La.1977); State v. Maduell, supra; State v. Bland, 260 La. 153, 255 So.2d 723 (1971). As the court explained in Maduell, 326 So.2d at 825, one theory behind permitting such in-field identifications is that prompt confrontations may promote fairness "by assuring reliability and the expeditious release of innocent suspects."
In the instant case, the victims were present where defendants were arrested so that circumstances did not necessitate the defendants being transported back to the scene of the crime, or of the arrest, for identification. The victims saw defendants within a short time after the incident and only a few blocks from its location as they searched with police for the robbers. Moreover, consistent with the theory espoused in Maduell that on the scene confrontations allow for the release of innocent suspects, the confrontation resulted in the release of a man who remained on the porch steps next to the stolen hat after the other man had run; the victims told the police officers they were certain he was not involved in the crime. Thus we find that under the circumstances here presented the one-on-one show-up identifications were not impermissibly suggestive. State v. Frank, supra.
There is no merit to this assignment.

*963 ASSIGNMENT OF ERROR NO. 3 (Dunbar), NO. 2 (Gordon)
Defendants assign error to the trial court's denial of their motions to sever. They argue that their defenses were antagonistic to each other and therefore they should have been tried separately.
Defendant Gordon filed a motion to sever with a request that he be afforded a separate trial from defendant Dunbar, contending that his defense was antagonistic to the defense of Dunbar. He related in his motion that Dunbar had made a signed statement protesting his own innocence and that defendant Gordon alone had committed the offense. The Dunbar statement attached to the motion said that Gordon had taken Dunbar's father's gun from Dunbar, and that Gordon robbed the two juveniles in Dunbar's presence, threatening to shoot the juveniles as Dunbar was telling him not to do so. In the statement Dunbar also expressed that Gordon had not told Dunbar what he was going to do with the gun.
Defendant Dunbar also filed a motion to sever with a request for a separate trial, but his motion did not specifically set forth that the two defendants had antagonistic defenses. He stated in response to a prayer for oyer that the state had presented to the defendants copies of written statements in which each contended that the other had committed the crime.[4] Dunbar's motion goes on to assert that the assistant district attorney had expressed in open court that she did not intend to use his statement in the trial in chief but that she intended to use both statements in cross examination of the defendants for impeachment purposes if they decided to testify in their own behalf. The motion further related that the district attorney's statement of intention and the nature of the defendants' written statements effectively prohibited them from testifying in their own behalf, and thus they were deprived of an opportunity for a fair trial. Under Article 704(2) of the Code of Criminal Procedure, they assert, justice required a severance of their cases.
Article 704(2) requires that "jointly indicted defendants shall be tried jointly unless . . . the court . . . is satisfied that justice requires a severance." We recently set out the law in this area in State v. Singleton, 352 So.2d 191, 192 (La.1977) wherein we said:
"There is no more classic situation of the need for a severance than one in which two co-defendants each place the blame for a crime on the other. State v. Thibodeaux, 315 So.2d 769 (La.1975); State v. Birbiglia, 149 La. 4, 88 So. 533 (1921). However, a mere allegation that a co-defendant intends to accuse the other does not automatically require severance. State v. Hunter, 340 So.2d 226 (La.1976). Instead, co-defendants seeking severance must present evidence of actual antagonism. State v. Jenkins, 340 So.2d 157 (La.1976); State v. Medlock, 297 So.2d 190 (La.1974). The trial judge's decision to disallow a severance under Article 704 is a discretionary one which will not be upset by this Court absent abuse. State v. Thibodeaux, supra; State v. Medlock, supra; State v. Smith, 283 So.2d 470 (La.1973)."
We will consider the motions of the defendants separately.
Defendant Gordon in his motion contended that the co-defendants' defenses were antagonistic; he relied in that motion upon the existence of the two statements as evidence of that antagonism. At the hearing on the motion, however, the trial judge offered Gordon's attorney the opportunity to state what his defense was going to be: "It's not necessary for you to take the stand as long as you tell me what the defense is going to be," said the judge. Counsel sought and received permission to speak to his client, and did so, and then stated:
"Your honor, if I could be assured that the statements will not be used on the impeachment, I can see there's no contradiction in the defenses of the two co-defendants."
The judge immediately advised he would not hold the state to an assurance of non-use *964 of the statement and denied the motion to sever.
Thus, given a chance to assert that the defenses would be antagonistic, and after conferring with his client, the attorney, while admittedly attempting to secure the advantage of a state commitment not to use the statements, not only desisted from giving such showing but asserted: "I can see there's no contradiction in the defenses of the two co-defendants." Although the admission of two mutually accusatory statements given soon after arrest would normally comprise evidence of actual antagonism, under these circumstances defendant's stark motion allusion to the existence of purportedly contradictory accusatory statements is hardly evidence of anticipated at-trial "actual antagonism." Furthermore, defendants' trial defense was alibi.[5]
Defendant Dunbar in his motion did not allege antagonistic defenses, and at the hearing on the motion to sever presented no evidence or statement concerning what his defense would be. As related hereinabove, his position in motion and at hearing was simply that the existence of the mutually accusatory statements, and the district attorney's asserted intention to use the statement or statements for impeachment purposes in the event one or both defendants should testify, effectively prohibited both defendants from testifying in their own behalf. At the hearing, however, counsel did rely in fact on the case of State v. Thibodeaux, supra, which grants a severance to defendants on the basis that their defenses were antagonistic, and, in brief, defendant Dunbar argues that his conviction should be reversed because the trial judge wrongly denied his motion for severance made because of antagonistic defenses. Thus, we will consider defendant Dunbar's motion to sever as if made on the basis of antagonistic defenses.
Like defendant Gordon, defendant Dunbar had given a statement which implicated himself, in that it put him at the scene, and accused his co-defendant directly of the crime. As we have heretofore stated, while such mutually accusatory statements would normally supply the evidence necessary to justify a severance under Article 704, here, defendants Dunbar and his attorney, like defendant Gordon and his attorney, were unable or unwilling to say at the hearing that the statements accurately represented their proposed trial defense. When defendant Gordon's attorney was asked to assert whether his client intended to adhere to his written admission, defendant Dunbar had the opportunity to insist that his position, unlike that of his co-defendant, was indeed the same as related in his written statement. He did not take that position, however, and, as we stated earlier, did not at the hearing emphasize or detail the defenses or the antagonism of the two co-defendant's trial defenses.
Thus we find that the assignments of both defendants have no merit, and that the trial judge did not abuse his discretion in refusing their severance motions.

ASSIGNMENT OF ERROR NO. 4 (Dunbar)
Dunbar alleges that the trial court erred in denying him a new trial. This assignment merely realleges those assignments previously discussed and found to be without merit.

Decree
Accordingly, the convictions and sentences of defendants Dunbar and Gordon are affirmed.
AFFIRMED.
DENNIS, J., dissents. See State v. Shivers, supra, and remarks in footnote 3 of the majority opinion.
NOTES
[1] The officers went upstairs, ostensibly to assure themselves the apartment was free of other accomplices, and found a white cap, a golf type cap and a wrist watch. These items were not introduced into evidence by the state.
[2] The record does reflect that Officer Wilson personally checked Apartments B and D. Other back up personnel had arrived and also were engaged in the search of the building, but the record does not reveal if they checked the remaining apartments or if any particular attention had been directed to defendant's apartment before that apartment was entered.
[3] At least two Justices of this Court, including the author, believe that determination of the correctness of the trial judge's ruling should be limited to evidence adduced at the hearing without reference to the trial testimony. See State v. Shivers, supra at 663.
[4] Gordon's statement is not made part of the record before us.
[5] We concede that if Gordon and Dunbar and/or their attorneys had told the court when invited to do so that the trial defenses of the two would be that posed in the statements "he did it"and inferentially or directly"I didn't do it"it would be immaterial that following denial of the motion the defendants respectively presented a different defense (alibi). But here where we construe Gordon's attorney's comment, "there's no contradiction in the defenses of the two co-defendants," use of the ensuing alibi defense, rather than the accusatory defense, has relevance.