520 F.2d 697
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dwight Timothy SCOTT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rufus WILLIAMS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronnie HOLLOMAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Marion C. TUCKER, Defendant-Appellant.
 Nos. 74-1373 to 74-1376
 United States Court of Appeals,
Ninth Circuit.
 Feb. 21, 1975.
As Modified on Denial of Rehearing and Rehearing En Banc
July 10, 1975.
 
 Richard M. Grossberg (argued), San Diego, Cal., Matthew N. Lees (argued in 74-1375), San Diego, Cal., for defendants-appellants.
 Matthew T. Kissane, Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.
 OPINION
 Before MERRILL and TRASK, Circuit Judges, and FERGUSON* District Judge.
 MERRILL, Circuit Judge:
 
 
 1
 On this appeal from a conviction under 18 U.S.C. § 2113(a) for bank robbery appellants assign as error denial of their motion to suppress evidence obtained in a warrantless search of an apartment and the subsequent introduction of such evidence at trial.
 
 
 2
 On September 7, 1973, at approximately 2:05 p.m., a branch of the Security Pacific National Bank in National City, California, was robbed by four male blacks armed with a sawed-off shotgun and revolvers. Local police promptly arrived and were advised by witnesses that the robbers were last seen driving a blue Chevrolet, the partial license number of which had been obtained. Ten minutes after the robbery the suspect getaway car was located. It was ascertained to have been stolen. A paper bag containing shotgun shells was found on the floor on the passenger side. The roadway showed tire marks indicating that another car had recently left the area under high acceleration, and this suggested to the officers that the robbers had switched cars. Similar tire marks were found on two successive street intersections leading away from the apparent switch point, at the last of which witnesses had observed a bronze colored car the partial license number of which had been obtained. The car had been occupied by blacks and had been travelling at a high rate of speed. Proceeding in the direction indicated the officers found other witnesses who had seen a bronze car occupied by blacks travelling at high speed. The trail led to a parking lot at the rear of a two-story apartment building containing approximately twenty apartment units opening onto and surrounding a courtyard. In the parking lot a bronze colored car was found at 2:45 p.m. The partial license numbers matched. The hood was warm to the touch indicating that the car had recently been driven. Witnesses previously interviewed were brought to the lot and picked out the car as the one they had seen travelling at high speed. Agents of the FBI, already summoned to the bank, were then summoned to the apartment house.
 
 
 3
 Other than the apartment house, the buildings nearest the parking lot were several "private houses" some 30 to 50 feet distant from the lot. One of the local officers present regarded the apartment house as a haven for law violators. At the hearing on the motion to suppress he testified: "Within the last year and a half I have made seven felony arrests out of this complex; armed robbery, burglary, purse snatching. It is noted to be predominantly black. Maybe two families, a husband and wife-type family in the complex. The rest are single adults. There is one white family that lives in the complex, but I don't recall which apartment it is". Another local officer who was present at the scene later testified that he had no knowledge of complaints concerning unauthorized parking in the lot at the rear of the apartment house. One FBI agent testified at the hearing on the motion to suppress that on his way to the apartment house he heard on his car radio that a witness had seen four blacks leave the car in the lot and enter the courtyard of the apartment. The identity of the witness, the source of the broadcast, or the person who made the broadcast was never ascertained.
 
 
 4
 With the attention of the officers thus centered on the apartment house, the officers commenced searching the apartments. Apartments 2 and 3 were known to a local officer as each being occupied by three to four adult male blacks. These apartments were searched without result. The same officer knew that apartments 1 and 5 were occupied by the manager and assistant manager. The manager, on inquiry from FBI, informed the agents that five of the remaining apartments were occupied by adult male blacks. A search of these apartments was begun on descending order of apartment number. Four of these apartments were searched; entrance was gained to one of them by use of the manager's pass key when knocking at the door brought no response.
 
 
 5
 At approximately 3:45 p.m. apartment 7 remained as the last unsearched apartment said to be occupied by adult male blacks and the attention of all in the courtyard focused on this apartment. For two minutes or longer agents knocked loudly and loudly announced their identity and desire to speak to the occupants. No response was received. The manager's pass key was obtained. One officer testified that at this point he "heard noises from the interior scuffling noises." The agents then entered by pass key. Appellants were found hiding there. Evidence was found and seized. This evidence was the subject of the motion to suppress.
 
 
 6
 The district court denied the motion to suppress on the theory that this case presented an instance of "hot pursuit" and that search of apartment 7 was, therefore, proper under Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). That case was concerned primarily with the need for warrant in the face of the exigencies of hot pursuit and with the proper scope of search after lawful entry. No problem was presented respecting probable cause to suppose the presence of the fugitive suspect. That is the problem presented in the case before us.
 
 
 7
 Under Warden v. Hayden the exigencies of hot pursuit can in proper circumstances excuse lack of warrant. See, e. g., United States v. Shye, 492 F.2d 886 (6th Cir. 1974); United States v. Ganter, 436 F.2d 364 (7th Cir. 1970). We agree with the district court that such circumstances were present here. Had the officers delayed their entry to apartment 7 to secure a search warrant for that apartment, the suspects might well have escaped or concealed evidence, and the risk of armed confrontation would have been increased.
 
 
 8
 The exigencies of hot pursuit cannot, however, excuse lack of probable cause. See Wong Sun v. United States, 371 U.S. 471, 479-80, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Since we discern no indication that a lower standard of probable cause applies where exigencies excuse lack of warrant than where a warrant is sought, see Almeida-Sanchez v. United States, 413 U.S. 266, 269, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); compare United States v. White, 401 U.S. 745, 768, 782 n. 19, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Harlan, J., dissenting), we apply no lower standard to this case. Accepting that pursuit here had brought the officers to the apartment house, this did not render each apartment in it subject to search. The occupants of each apartment had their independent right to be free from unreasonable search. No apartment was subject to entry in the absence of probable cause to believe that the robbers were present in that particular apartment.
 
 
 9
 The question, then, is whether the officers at apartment 7 had, at the time of entry, probable cause to believe that the fugitives they sought were there; whether, with action frozen at that moment, a warrant could properly have been issued for search of the apartment. In our judgment it could. There was reasonable cause to believe that the fugitives had entered the apartment complex. There was knowledge that they were not present in 6 of the 7 units most likely to be their objectives.[1] Apartment 7 then remained as the most likely choice. There was cause to believe that it was occupied and that the occupant or occupants did not wish to admit their presence.
 
 
 10
 The same circumstances excuse the noncompliance by the federal officers with 18 U.S.C. § 3109 and by the state officers with Cal.Penal Code § 844 (West 1970), see Miller v. United States, 357 U.S. 301, 305-06, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), by entering without prior announcement of their purpose. Such announcement was not required once there was probable cause to suspect that the apartment was occupied by the robbers, who had wielded a sawed-off shotgun and revolvers during the robbery. United States v. McShane, 462 F.2d 5 (9th Cir. 1972); United States v. Smith, 456 F.2d 1236 (9th Cir. 1972), cert. denied, 410 U.S. 912, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973); Gilbert v. United States, 366 F.2d 923 (9th Cir. 1966), cert. denied, 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967), 393 U.S. 985, 89 S.Ct. 460, 21 L.Ed.2d 446 (1968); People v. Tribble, 4 Cal.3d 826, 94 Cal.Rptr. 613, 484 P.2d 589 (1971).
 
 
 11
 We conclude that the warrantless search was proper. The evidence thus obtained was sufficient to sustain the conviction of each of the four appellants.
 
 
 12
 Judgment affirmed.
 
 FERGUSON* District Judge (dissenting):
 
 13
 I must respectfully dissent. Justice Fortas used the term "hot pursuit" to summarize the kind of circumstance discussed by the majority in Warden v. Hayden. See 387 U.S. 294, 310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (concurring opinion). An examination of the facts of that case makes clear that the phrase should have a narrow meaning. Yet I fear that a phrase used casually in a concurring opinion has now been given a meaning well beyond what was intended, and beyond what the Constitution allows. In addition, it's not at all clear that the Hayden doctrine is apposite in this case.
 
 
 14
 In Hayden, a cab driver was robbed, and two other drivers followed the robber to a house. The location was communicated to the police, who went immediately to the house, announced themselves, and asked the woman who answered the door if they could search the house for the suspect. The woman did not object, so the officers spread throughout the house looking for the suspect. At approximately the time when the robber was found upstairs, one officer found guns in a toilet, and another found clothes similar to those worn by the robber, stuffed into a washing machine downstairs.
 
 
 15
 The crucial question was whether the guns and clothes were legally seized, since they were found in a broad search made without a search warrant. The Supreme Court found the search to have been permissible, since it was the only way for the officers to proceed to find the man whom they had probable cause to arrest for the crime. Permitting this kind of search also allowed the officers to maximize their safety, by assuring that there were no other people or weapons in the house to threaten them as they sought the suspect. See 387 U.S. at 298-300, 87 S.Ct. 1642.
 
 
 16
 The thrust of the majority opinion was that in such a situation, when the police were hot on the trail of the suspected perpetrator, and had probable cause to arrest him, they were entitled to one of the few, very limited, exceptions to the requirement that all searches be conducted pursuant to a warrant. The decision in no way related to, or reduced, the probable cause requirement for arresting a suspect or for searching a house. The phrase "hot pursuit" has therefore been misused when it has been read to imply that the legal standard for arrest or search is somehow diminished when the police are chasing right behind a suspect.
 
 
 17
 Making the abuse of the phrase even worse is the occasional practice of finding a "hot pursuit" any time that the police trace a suspect through an investigative process uninterrupted by any substantial period of time. See United States v. Mitchell, 457 F.2d 513 (6th Cir.), cert. denied, 409 U.S. 866, 93 S.Ct. 161, 34 L.Ed.2d 114 (1972); United States v. Rose, 440 F.2d 832 (6th Cir.), cert. denied, 404 U.S. 838, 92 S.Ct. 153, 30 L.Ed.2d 71 (1971). By contrast, in Hayden a particular known robber was actually followed to a particular residence; the specificity of the identification and the immediacy of the pursuit were crucial factors in the case. In our case, the particular suspects were followed only in the way that a frontier scout "followed" a person who passed that way hours earlier. The police showed ingenuity in tracking what they thought might be a car which might have picked up the identified suspects. But if this process is called "hot pursuit," then what distinguishes it from a 48-hour, or a 2-month, process of investigation carried on uninterruptedly? Would an arrest at the end of such an investigation be granted some kind of special "hot pursuit" treatment just because the police had been constant in their efforts?
 
 
 18
 These last questions would be no more than rhetorical if there weren't the possibility that the phrase "hot pursuit" will somehow be converted into a doctrine far exceeding its original meaning. As discussed earlier, the Hayden doctrine does no more than allow a fairly broad search while seeking a suspect in order to arrest him. Yet here we have the majority invoking the doctrine when the breadth of the search was not in issue at all. All of the contested evidence was in plain view, either in the open or in the closet with one of the hiding suspects. The issue in this case is not the legality of a search, but rather the legality of the entry in order to arrest. In other words, did the officers have probable cause to arrest whoever was in apartment 7? It's hard to understand why the "hot pursuit" notion comes into play at all.
 
 
 19
 My fear is that it's somehow being used to dilute the notion of probable cause, possibly signaling a regression from a constitutional/historical view of the Fourth Amendment to a "pragmatic" one which gives the government excessive power. See Chimel v. California, 395 U.S. 752, 764-65, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The majority implies that normal probable cause standards apply, but it finds probability where I think none exists. Perhaps the automotive link to the apartment complex was probable; that is a judgment call to which I'm willing to accede for the purposes of this discussion. Once the trail gets to the building, however, what probable links to apartment 7 are there? The facts available were that: an unidentified witness said that he saw four blacks leave the car and enter the building; there was some history of criminals residing in the building; seven of the units were occupied by blacks; a search of six of the seven had yielded no suspects. All that this says to me is that if the suspects were in one of the black-leased units, it would have to be number 7. But why should it be presumed that they were in one of those units? There was no proof that the men entering the building were the suspects; more importantly, there was no proof that the men, whoever they were, hadn't left the building before the police arrived. Even if they were the suspects, and were still in the building why did they have to be in one of the black-leased apartments? Couldn't they have been with white friends or white abettors? Couldn't they have been holding someone hostage, or simply occupying in one way or another one of the non-black apartments? With hindsight we know that the suspects were in apartment 7, but it was hardly a probability or a likelihood at the time that the officers entered the apartment with a passkey. Given that there was no probable cause for arrest, there was certainly no justification for the entry to arrest. The materials were therefore illegally seized, even though they were in plain view.
 
 
 20
 I must add in passing that I am troubled by the majority's easy acceptance of the officers' search of the six other black-leased apartments.[1] Although appellants here clearly do not meet the standing requirements set forth in Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), for challenging the seizure of evidence, it's not clear that the Brown standards are the appropriate ones here. The majority is perhaps acting precipitously in assuming that the criteria used for determining standing to challenge an illegal seizure of goods also govern the standing to challenge a series of general searches without probable cause, the results of which are then used to find probable cause for arresting the one now making the challenge. The majority position puts this court in the position of condoning or, at the least, relying upon searches of the very kind intended to be prohibited by the Fourth Amendment. And the appellants were, in effect, the targets of the searches, even though they were not the residents of the searched apartment. The whole purpose of the searches was to seize the appellants, and it was the searches upon which the majority relies in justifying that seizure. It therefore seems a bit hasty to deny standing on the basis of a case in which the target was evidentiary objects, rather than the suspects themselves. Such a decision gives our imprimatur to a police procedure which uses warrantless general searches to create probable cause through a process of elimination that makes a mockery of the Fourth Amendment.
 
 
 21
 The resolution of the standing question is, of course, not necessary to this dissent, since, even assuming the legality of the searches, there was no probable cause for the entry and arrest. Accordingly, I would reverse.
 
 
 
 *
 Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 The record does not reveal the circumstances under which the officers secured admission to the apartments entered other than the one entered by passkey. However, even assuming impropriety, appellants lack standing to complain of the intrusion. Such would have been the rule had incriminating evidence been seized. See Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). In our judgment no broader rule of standing should apply where violations of the rights of third parties merely contribute to the existence of probable cause
 
 
 *
 Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 The record does not make clear whether consent was obtained for any of these searches, but appellees concede that at least one of the apartments other than that in which appellants were found was entered by means of the passkey. So, at least one of the six searches which supposedly created probable cause for the arrests herein was accomplished without a warrant, consent, or probable cause