Gloria LLAGUNO, Guillermo Llaguno, Leticia Llaguno, Pauline Belcher, Carmen Noyola, James David Llaguno, Gloria Jane Llaguno, and James David Llaguno, Jr., Roger Llaguno, and Rene Llaguno, minors, by their father and next friend, James David Llaguno, Plaintiffs-Appellants,

v.

Edward MINGEY, William Connor, Joseph Sparks, James Troken, Joseph Fallon, James Sesso, Martin Burke, Edward Cagney, William Rooney, Michael Fleming and James Lanners, Defendants-Appellees.

No. 83–1372.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1984.

Decided July 10, 1984.

Rehearing En Banc Granted Sept. 18, 1984.*

* Judgment and opinion vacated.

Rick Schoenfield, Ettinger & Schoenfield, Ltd., Chicago, Ill., for plaintiff-appellant.

Philip L. Bronstein, Chief Asst. Corp. Counsel, Chicago, Ill., for defendant-appellee.

Before PELL and FLAUM, Circuit Judges, and HENLEY, Senior Circuit Judge.[*]

HENLEY, Senior Circuit Judge.

Appellants brought suit under 42 U.S.C. § 1983 alleging that certain members of the Chicago Police Department violated their civil rights in entering and searching their home without probable cause. In addition, appellant James David Llaguno (hereinafter referred to as David Llaguno) alleged that he was illegally arrested, searched, and detained for forty-two hours. The case proceeded to trial and a jury returned a verdict for the officers on all counts. On appeal, the appellants claim that the district court erred in the giving of certain jury instructions and in various evidentiary rulings. They also allege that they should have prevailed on some of their claims as a matter of law. Since we agree with the latter contention, we reverse in part and affirm in part.

I.

On the evening of January 7, 1980 two robberies occurred in the Chicago area in which four people were killed and three others wounded. Witnesses related to the police that two or possibly three young male Hispanics committed the first robbery and that two young male Hispanics committed the second. A light green Ford with primer on one of the doors was used as a getaway car in both crimes. The robberies occurred within a two hour time period and a young girl was abducted by the gunmen during the second robbery.

At approximately 9:00 p.m. Sergeant Mingey of the Chicago Police Department overheard a police radio broadcast that other officers were in pursuit of the suspect vehicle. A second broadcast related that the vehicle had crashed and an officer had been wounded. Officers Mingey, Connor and Sparks drove to the scene of the crash and were subsequently joined by several other officers. When they arrived, they discovered that one of the suspects, later identified as Luis Garcia, had been shot and captured and that the girl had been recovered unharmed. The other male Hispanic, however, escaped on foot. None of the appellees in the instant case was involved in the chase or shooting.

Mingey was told that a license check of the vehicle had been made. The officers testified that they found out that the car was registered to a Llaguno but they could not remember to which Llaguno. The car was in fact registered to a Vilma Llaguno at appellants' address and the registration papers were introduced into evidence. Without attempting to secure either a search or arrest warrant, the officers went back to headquarters, picked up a sledgehammer and a shotgun, and proceeded to the Llaguno residence.

Upon their arrival, Officers Fallon and Troken assumed surveillance of the rear of the residence while Mingey, Connor, Sparks and two or more additional and unknown officers went to the front door. Mingey banged on the door and ordered Gloria Llaguno[1] to open it or have it

---

[*] The Honorable J. Smith Henley, Senior Circuit Judge of the United States Court of Appeals, Eighth Circuit, is sitting by designation.

1. All of the appellants are related and live together. Gloria and Guillermo are the parents of David, Leticia, Pauline Belcher and Carmen Noyola. David is married to Gloria Jane and

knocked down. As she started to open the door, Mingey pushed his way in, shoving Mrs. Llaguno aside. Mingey and the other officers then rushed in, although Troken and Fallon entered a bit later. All of the officers had their revolvers drawn and Connor had a shotgun. Mingey told the officers to secure the upstairs and downstairs of the house. Guillermo Llaguno was seated at the kitchen table and Mingey ordered him into the living room. As David Llaguno came up from the basement where he had been eating supper, Connor pointed the shotgun at him and searched him. In response to questioning by the officers, David said that he owned the light green Ford but that he had loaned it to a friend. He was thereafter taken into custody where he was held for forty-two hours. During this time he was neither brought before a magistrate nor charged with any crime.

Meanwhile, all the other appellants were forced into the living room and detained there. Carmen, Pauline and Leticia were brought down from the second floor at gunpoint. Although Pauline and Mrs. Llaguno testified that the three girls were searched when they were brought downstairs, the officers denied this. Gloria Jane Llaguno, David Llaguno's wife, and her children were brought up from the basement. Although the house and garage were searched, the extent of the search was disputed.

There was evidence that the officers threatened to shoot some of the appellants if they did not remain quiet and that some force was used. The officers denied making threats although they did admit some use of profanity.[2] It is undisputed that appellants, especially the children, were frightened and upset throughout the incident.[3]

As it turned out, the suspect who escaped from the car was shot and killed by other Chicago police officers while appellees were at the Llaguno home. He was later identified as Roger Llaguno, another son of Gloria and Guillermo who did not live at the Llaguno home.

Gloria and Guillermo Llaguno testified that Officers Fleming and Lanners came to their house on three occasions following David's release from custody. They stated that the officers entered their home without their consent and asked to talk to David. The officers admitted that they went to the Llaguno residence to ask David some questions in January and early February of 1980, but denied that they entered the house.

Appellants sought damages under § 1983 alleging that the officers entered their home, arrested David Llaguno, searched their home and persons, used force on them, and detained them, all without probable cause and in violation of their constitutional rights.[4] In a separate count, David Llaguno sought damages for the time he spent in custody following his arrest. Appellants also alleged harassment and common law assault in a pendent claim. The district court denied appellants' motion for a directed verdict at the close of

their children include James David Jr., Roger and Rene. At the time of the incident, they were ages 5, 4 and 2 years old, respectively. Carmen was 16 years old and is mentally retarded.

2. Gloria Llaguno testified that all the officers were in plain clothes and that, when they asked the officers what was the matter, the officers told everyone to shut up or they would "blow their brains out."

3. Gloria, Carmen and the children were crying and Leticia began to shake uncontrollably. Sergeant Mingey testified that while the family was held in the living room, some of them were

crying and upset and that they had reason to be upset.

4. Count I was brought by all the appellants for illegally entering their home. Count II was brought by David for his illegal arrest. Count III sought damages for the search of the house, while Count IV was predicated on the search of their persons. Count V was brought by Gloria and Guillermo for the illegal use of force. Count VI was brought by all of the appellants except David for illegal detention. Count VII was brought by David for the time he spent in custody following his arrest. Count VIII was for illegal entry and harassment and Count IX was for common law assault.

all the evidence and judgment for the officers was entered on the jury verdicts.

## II.

■ We first address the appellants' contention that the officers who entered their home on the night of January 7, 1980 lacked probable cause as a matter of law and that therefore their motion for a directed verdict should have been granted. A motion for a directed verdict is properly denied "where the evidence, along with inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions." *Hohmann v. Packard Instrument Co.,* 471 F.2d 815, 819 (7th Cir.1973); *see also Richardson v. City of Indianapolis,* 658 F.2d 494, 501 (7th Cir.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982).

In *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), the Supreme Court, recognizing that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *id.* at 585, 100 S.Ct. at 1379, held that warrantless in home arrests are prohibited in the absence of exigent circumstances. *See also Welsh v. Wisconsin,* —— U.S. —— at —— – ——, 104 S.Ct. 2091 at 2098–2099, 80 L.Ed.2d 732 (1984) (warrantless in home searches and seizures are presumptively unreasonable). It is clear then that in order for the officers' actions to be justified in the instant case, there must have been both probable cause to believe that the person who committed the robberies was in the Llaguno residence and also the situation at time of entry must have amounted to the sort of emergency or danger described in the cases as "exigent circumstances." *See Payton,* 445 U.S. at 583, 100 S.Ct. at 1378.

■ Probable cause to effect an arrest exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person in believing that a particular suspect had committed an offense. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion, though the arresting officer need not have in hand evidence which would suffice to convict. The quantum of information which constitutes probable cause—evidence which would "warrant a man of reasonable caution in the belief" that a felony has been committed—must be measured by the facts of the particular case. The history of the use, and not infrequent abuse, of the power to arrest cautions that a relaxation of the fundamental requirements of probable cause would "leave law-abiding citizens at the mercy of the officers' whim or caprice."

*Wong Sun v. United States,* 371 U.S. 471, 479, 83 S.Ct. 407, 413, 9 L.Ed.2d 441 (1963) (citations and footnotes omitted).

■ Although in an action under § 1983 whether probable cause exists in a given situation is generally a question for the jury, *see Giordano v. Lee,* 434 F.2d 1227, 1230 (8th Cir.1970), *cert. denied,* 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971), "[w]here there is no conflict in evidence, the court may make its own legal determination of probable cause." *Garris v. Rowland,* 678 F.2d 1264, 1270 (5th Cir.), *cert. denied,* 459 U.S. 864, 103 S.Ct. 143, 74 L.Ed.2d 121 (1982); *Banish v. Locks,* 414 F.2d 638, 641 (7th Cir.1969). Here, even though exactly what occurred after the officers gained entry to the Llaguno home was disputed, the facts with respect to the existence of probable cause were basically uncontested. The officers knew that two robberies had occurred and that several people had been either killed or wounded. They knew that the suspect who escaped on foot was a young male Hispanic. They did not know the suspect's height, weight, build or any other identifying characteristics. They also knew that the vehicle used in both robberies was registered to a Lla-

guno[5] at appellants' address and that this address was in the general vicinity of the place where the crimes occurred. Thus, although the officers knew that a Llaguno may have had some connection with the vehicle used in the robberies, they had no information which would indicate that a Llaguno directly participated in the crimes. Nor did they have any information about the possible occupants of the Llaguno home. They did not know if the suspect resided there or whether he was located in the house at the time. The officers neither saw the suspect enter the Llaguno home nor were they told by any witnesses that a young male Hispanic had recently entered. In other words, the officers had a general description of a suspect (a young male Hispanic) who used a vehicle which was only connected to the Llagunos' address by the registration papers. Viewing these facts in the light most favorable to the officers, we nevertheless must conclude that the officers lacked probable cause to enter the Llaguno home without a warrant and that no reasonable juror could reach a different conclusion.

 We make this determination for several reasons. First and foremost is that it is clear that the officers had no particular individual suspect in mind when they entered the Llaguno home. It is axiomatic that a lawful arrest requires probable cause to arrest a particular person. *See e.g., Wong Sun,* 371 U.S. at 481 n. 9, 83 S.Ct. at 414 n. 9; *Mallory v. United States,* 354 U.S. 449, 456, 77 S.Ct. 1356, 1360, 1 L.Ed.2d 1479 (1957); *Johnson v. United States,* 333 U.S. 10, 15–16, 68 S.Ct. 367, 369–370, 92 L.Ed. 436 (1948); *West v. Cabell,* 153 U.S. 78, 85, 14 S.Ct. 752, 753, 38 L.Ed. 643 (1894); *United States v. Doe,* 703 F.2d 745, 747 (3d Cir.1983); *Powe v. City of Chicago,* 664 F.2d 639, 645–47 (7th Cir. 1981). "Where the standard is probable cause, a search or *seizure of a person must be supported by probable cause particularized with respect to that person.*"

*Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979) (emphasis added). The arresting officers must either know the suspect's name or have some description of him that is particular enough so that he may be identified with reasonable certainty. *West,* 153 U.S. at 85–87, 14 S.Ct. at 753–754; *Powe,* 664 F.2d at 645; 2 W. LaFave, *Search & Seizure* § 4.5, at 89 (1978). In the present case, all the officers knew was that the person for whom they were searching was a male Hispanic in his twenties whose last name might be Llaguno. This lack of particularity is graphically illustrated by Mingey's testimony:

Q. And if there had been ten male Latinos in the house, were you going to arrest them all?

A. No, sir.

Q. You wouldn't have known who to arrest then, would you?

A. Yes, sir.

Q. If there had been ten male Latinos David's age, who were you going to pick out?

A. *I'd have no idea until I talked to them.*

Q. Because before you came to that house you didn't have a particular person in mind to arrest, did you?

A. Just a male Latin in his twenties by the name of Llaguno. (emphasis added.)

In addition, Officer Troken admitted that at the time of entry they did not know who they were going to arrest.

 The officers needed probable cause *before* they entered the house. The entry cannot be justified by information obtained subsequently. *See, e.g., Wong Sun,* 371 U.S. at 482–84, 83 S.Ct. at 414–16; *Johnson,* 333 U.S. at 16–17, 68 S.Ct. at 370–371. The officers' own testimony conclusively shows that they had no particular suspect or a specific description of a suspect prior

---

**5.** Although the registration papers conclusively show that the vehicle was registered to Vilma Llaguno, the officers denied that they had any knowledge of the owner's first name. They testified that, at the time, they only knew that the car was registered to a Llaguno. In reviewing the evidence at hand at this juncture we accept their testimony as true.

to their entry. "It is not the function of the police to arrest, as it were, at large and to use an interrogating process . . . in order to determine whom they should charge before a committing magistrate on 'probable cause.'" *Mallory,* 354 U.S. at 456, 77 S.Ct. at 1360.

■ Moreover, in assessing the officers' criteria for probable cause to effect a warrantless arrest, it is appropriate to consider whether there was sufficient information to obtain an arrest warrant. *See Whiteley v. Warden,* 401 U.S. 560, 564–66, 91 S.Ct. 1031, 1034–36, 28 L.Ed.2d 306 (1971); *Wong Sun,* 371 U.S. at 479–81, 83 S.Ct. at 412–14; *Merrill v. United States,* 463 F.2d 521, 523 (7th Cir.1972). We do not believe an arrest warrant could have issued for any Hispanic in his twenties whose name might be John Doe Llaguno.

As indicated, the officers did not actually know at the time that the fleeing felon was a Llaguno. They only knew that they were looking for a young male Hispanic who used a car registered to a Llaguno. They did not know whether the car had been borrowed from a Llaguno or whether it had been stolen just prior to the robberies and not yet reported stolen.[6] The description of a young male Hispanic, of course, is so general as to be of small value. In any case, the mere fact that the alleged suspect may have had some association with or was in some way related to the Llagunos does not establish probable cause to arrest any and all young male Llagunos or to enter the Llaguno home without a warrant since "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause...." *Ybarra,* 444 U.S. at 91, 100 S.Ct. at 342.

■ Not only did the officers lack a particular suspect, it appears also that they had no information that the general suspect or even anyone matching the general description of a suspect was in the Llaguno home or even resided there. The officers' own testimony establishes that they did not see any suspect enter the house, they did not know if a suspect, or if anyone for that matter, was in the house, they were not in hot pursuit, they had not been told by anybody that a suspect had entered the house, and they did not make any inquiry regarding the house's occupants prior to their entry. In short, they did not know who might be inside the house, how long such persons might have been there, or what relationship these individuals might have to the fleeing suspect.[7] All that they knew in this regard was that the Llaguno home was in the general vicinity of the crimes and their general experience that "fleeing felons tend to go home." Even though it is not necessary that the officers directly observe the suspect enter the house, they must have reasonable grounds or information to believe that the subject of their search is within the place to be searched, especially when, as is the case here, the place to be searched is that of a third party. *See Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *United States v. Jones,* 641 F.2d 425, 428 (6th Cir.1981); *Vasquez v. Snow,* 616 F.2d 217, 220 (5th Cir.1980); *United States v. Manley,* 632 F.2d 978, 983 (2d Cir.1980), *cert. denied, Williams v. United States,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *United States v. Scott,* 520 F.2d 697, 700 (9th Cir.1975), *cert. denied,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976); *Fisher v. Volz,* 496 F.2d 333, 338 (3d Cir.1974). Even assuming *arguendo* that the officers reasonably perceived the Llaguno home as the suspect's home,[8] the officers would still need

---

6. Apparently the officers did know that the vehicle had not been reported stolen as of the time the license check was made.

7. Officer Sparks testified as follows:
 Q. You didn't know if the house was deserted or if it was filled with fifty children, did you?

A. Correct.

8. We have already questioned the reasonableness of the officers' assumption that the suspect was a Llaguno merely because the vehicle used in the robberies was registered to a Llaguno. However, allowing the officers the inference that the suspect was probably a Llaguno, they

more than a hunch to believe that the suspect was in the residence. *See Payton*, 445 U.S. at 603, 100 S.Ct. at 1388 ("arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within*") (emphasis added); *see also* 445 U.S. at 616, 100 S.Ct. at 1395 (White, J., dissenting). We believe it is clear that the information which the officers possessed relating to the suspect's presence in the Llaguno home was no more than a hunch or mere suspicion.

▪▪▪ We recognize that the police were dealing with a grave situation; the perpetrators had shown their affinity for violence in a series of particularly heinous crimes. However, while the exigencies of the moment may in some circumstances excuse the lack of a warrant, *see Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), they can never excuse the lack of probable cause. *See Chambers v. Moroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *Wong Sun*, 371 U.S. at 479–80, 83 S.Ct. at 412–13; *see also Scott*, 520 F.2d at 700; *Fisher*, 496 F.2d at 339. We must not relax the requirement of probable cause simply because the police are faced with an atrocious crime. "If the 'emergency' concept were to be given full sway, it could swallow up the entire body of Fourth Amendment law, for most search situations involve at least a colorable claim of emergency." C. Whitebread, *Criminal Procedure* § 8.01, at 153 (1980).

We also recognize that we should not, as a reviewing court, second-guess too critically the actions of law enforcement officials. Nevertheless, we cannot help but conclude that the officers involved here overreacted to the sparse information that was available to them. They could have secured the perimeter of the house and waited until someone matching the general description of the suspect undertook either to enter or leave the house and then approached the individual to ask questions. Using a similar stakeout device, they could have knocked on the door and sought permission to enter or they could have inquired as to how Vilma Llaguno's car came to be used in the crimes. In any of the above situations, sufficient security around the house could have prevented any attempted escape of the felon. In any event, we are left with the conviction that, in the absence of probable cause, something short of a forcible nighttime entry into a private residence was necessary here.[9]

In sum, because the officers' own admissions establish that they had only a general description of a suspect who was not sufficiently factually tied to the automobile or the Llaguno home, the officers lacked probable cause to make the warrantless entry as a matter of law. Justice Jackson's oft quoted words are particularly applicable here.

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.... Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy

---

still had to make two further inferences in order to reach the conclusion that the suspect was in the Llaguno home: (1) that the Llaguno suspect lived with the appellants; and (2) that the suspect was presently there.

9. Because the officers needed both probable cause and exigent circumstances to make the warrantless entry, and because we have concluded that they lacked probable cause, it is unnecessary to inquire further into the issue of the extent of the exigency at the time.

must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.

*Johnson,* 333 U.S. at 13–14, 68 S.Ct. at 368–369.

## III.

■■■■ Our conclusion as to the lack of probable cause does not end our inquiry for there is also the matter of the officers' good faith to deal with. *See Whitley v. Seibel,* 613 F.2d 682, 685 (7th Cir.1980), *cert. denied,* 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982). If the officers had a reasonable good faith belief that they had probable cause to enter the Llaguno home, they would not be liable for damages, notwithstanding the fact that the entry was unconstitutional. *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). Appellants contend that since the officers should have known that their acts violated clearly established constitutional standards of probable cause, the defense of qualified immunity is unavailable to them as a matter of law. We agree.

We review appellants' motion for a directed verdict in regard to the good faith issue under the same standard utilized in our previous discussion. We must view the evidence in the light most favorable to the officers and reverse the denial of the motion only if reasonable persons could not differ in concluding that the officers lacked good faith. *See Richardson,* 658 F.2d at 501.

Prior to *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the test for determining whether a government official was entitled to qualified immunity contained both objective and subjective components. *Crowder v. Lash,* 687 F.2d 996, 1007 (7th Cir.1982). In *Harlow,* the Court

> formulated a revised qualified immunity standard that does not include a subjective component; the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." If the constitutional right in question was clearly established at the time the challenged conduct took place, the qualified immunity defense ordinarily should fail, since a reasonably competent public official is expected to know the law governing his conduct.

*Crowder,* 687 F.2d at 1007 (citations omitted).[10]

We know of no right more clearly established than the right of a citizen to remain free of governmental intrusion absent probable cause to believe that he is engaged in criminal conduct. The requirement that the police have a particular subject or description of a subject in mind before forcing their way into a private residence has been traced by this court to the Supreme Court's 1894 decision in *West v.*

---

**10.** In using the former test of subjective and objective good faith, courts have generally ruled that since the subjective component involves questions of motive and intent, these inquiries are ordinarily jury questions. *See Landrum v. Moats,* 576 F.2d 1320, 1329 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978); *Meiners v. Moriarity,* 563 F.2d 343, 348 (7th Cir.1977); *Askew v. Bloemker,* 548 F.2d 673, 679 (7th Cir.1976). The *Harlow* Court, in eliminating the subjective portion of the test, stated that "[i]nquiries of this kind can be peculiarly disruptive of effective government." *Harlow,* 457 U.S. at 817, 102 S.Ct. at 2738. Ostensibly then, the Supreme Court removed these types of factual inquiries in order to protect public officials from insubstantial claims and to allow the officials to avoid liability without the need to put the questions to a jury. *See id.* In the context of the instant case, however, the converse can also be true. Just as the objective good faith of a public official can defeat a § 1983 claim without the need of presenting the question to a jury, the objective lack of good faith, as exemplified by the official's disregard for clearly established constitutional standards and by his inability to show the extraordinary circumstances required by *Harlow,* may, in appropriate circumstances, defeat the official's claim of immunity without the need of presenting the question to a jury. *See, e.g., Hartnett v. Schmit,* 501 F.Supp. 1024 (N.D.Ill.1980) (officials could not meet objective standard of good faith as a matter of law).

*Cabell,* 153 U.S. 78, 14 S.Ct. 752, 38 L.Ed. 643 (1894). *See Powe,* 664 F.2d at 645. Since *West,* the Court has reaffirmed this principle many times. *See, e.g., Wong Sun, supra; Mallory, supra; Johnson, supra.* Indeed, the particularity requirement is itself contained in the fourth amendment. It provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing ... the persons ... to be seized.*" (emphasis added.). *See Wong Sun,* 371 U.S. at 481 n. 9, 83 S.Ct. at 414 n. 9. Moreover, unreasonable searches and seizures conducted without a warrant are prohibited by the first clause of the amendment. In short, the particularity and probable cause requirements are quintessentially the type of clearly established constitutional rights of which public officials, and police officers in particular, can be expected to know.[11] Probable cause was so conspicuously lacking at the time of the officers' entry into the Llaguno home that, notwithstanding the gravity of the situation, the officers were unreasonable in thinking they could proceed without a warrant. Therefore, regardless of the officers' actual subjective belief that they were within the law in entering the Llaguno home without a warrant, we believe that such a belief was unreasonable and that they should have known that their acts were unconstitutional.

Having concluded that the officers entered the Llaguno home and arrested David Llaguno unlawfully and without a reasonable belief that they possessed probable cause, we reverse the jury's verdict as to Counts I, II, III, VI, and, as to David, Count IV. Because we have disposed of this portion of the appeal in this manner, it is unnecessary to reach appellants' alternative contentions in respect to these particular counts. Specifically, we do not reach their contentions that the district court erred in instructing the jury on the issues of probable cause and exigent circumstances and that the court erred in not allowing appellants' expert witness to testify as to the existence of probable cause.

IV.

Count VII was brought by David Llaguno for his alleged unlawful detention following his arrest. He was detained by several Chicago police officers[12] for forty-two hours without being brought before a magistrate for a judicial determination of probable cause. In addition, he was neither charged with any crime nor given the opportunity to post bond during this time. Llaguno contends that this detention violated due process and the fourth amendment as a matter of clearly established constitutional law and that therefore his motion for a directed verdict on Count VII should have been granted.

The fourth amendment requires a judicial determination of probable cause as a prerequisite to an extended restraint of liberty following arrest. *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). The Supreme Court explained:

[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest. Once the suspect is in custody, however, the reasons that justify dispensing with the magistrate's neutral judgment evaporate. There no longer is any danger that the suspect will escape or commit further crimes while the police

---

**11.** In addition, it is clearly established that the police cannot cross the boundaries of one's home unless they either (1) have a valid warrant, or (2) possess probable cause and exigent circumstances exist which excuse the lack of a warrant.

The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated."
*Payton,* 445 U.S. at 589, 100 S.Ct. at 1382.

**12.** It was stipulated that following his arrest Llaguno was in the custody of Officers Sesso, Burke, Cagney and Rooney.

submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships. Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty. When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty.

*Id.* at 113–14, 95 S.Ct. at 862–63 (citations omitted).

 Thus, when a suspect is arrested without a warrant, there must be a judicial determination of probable cause by a neutral and detached magistrate "promptly after arrest." Several courts have held that the probable cause determination must ordinarily be made within twenty-four hours of arrest. *See Bernard v. City of Palo Alto*, 699 F.2d 1023 (9th Cir.1983); *Pugh v. Rainwater*, 483 F.2d 778 (5th Cir.1973), *rev'd on other grounds sub nom. Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Sanders v. City of Houston*, 543 F.Supp. 694 (S.D.Tex.1982); *Dommer v. Hatcher*, 427 F.Supp. 1040 (N.D.Ind.1975), *rev'd in part on other grounds*, 653 F.2d 289 (7th Cir.1981); *see also Lively v. Cullinane*, 451 F.Supp. 1000 (D.D.C.1978) (one and one-half hours is outer limit).

The time of detention, however, is not the only factor to consider.

The time fixed was not meant to define the constitutional right. Detention for less than 24 hours without a probable cause hearing would violate the Constitution in a particular case if the circum-

stances were such that the administrative steps leading to a magistrate's determination reasonably could have been completed in less than 24 hours. The court's order provided a mechanism for obtaining judicial approval of delay in excess of 24 hours if exigent circumstances justify that delay.

*Bernard*, 699 F.2d at 1025. Other factors may include the reasons for delay, whether delay was justified by the administrative steps that were necessary to be taken, such as transportation, booking and filing charges, the availability of a judicial officer, and the number of people to be processed. *See Sanders*, 543 F.Supp. at 700–02 (citing analogous cases construing Fed. R.Crim.P. 5(a)'s requirement that the arrested person be brought before a magistrate "without unnecessary delay").

 Even viewing the facts in the light most favorable to the officers, we conclude that Llaguno should prevail on this claim as a matter of law. The critical facts are undisputed by the officers. David Llaguno was held in custody for forty-two hours without a probable cause determination by a magistrate and without being charged with any crime.[13] Approximately five hours after being taken into custody, Officer Sesso was told by an Assistant State's Attorney that he would not approve charges against Llaguno because there was insufficient evidence. The following afternoon, the officers were again told by two other Assistant State's Attorneys that no charges would be filed. Despite this, the officers admitted that they continued to hold Llaguno for twenty-four hours *after* they were told by prosecutors for the second time that no charges would be filed. Finally, it is also undisputed that a magistrate was available at nearly all times Llaguno was in custody and that he was held past five court calls.

In these circumstances, we have no trouble in concluding that David Llaguno's detention clearly exceeded the "brief period

---

**13.** David Llaguno has never been charged with any crime arising out of the events which took place on January 7, 1980.

of detention to take the administrative steps incident to arrest." *Gerstein,* 420 U.S. at 114, 95 S.Ct. at 863. The only explanation offered by the officers as to why Llaguno was not brought before a magistrate when one was clearly available was that he was a "central figure" in the ongoing criminal investigation.[14] Instructive in this regard is Officer Burke's statement that "Llaguno was held until it could be shown he had no complicity in this spree beyond allowing the offenders to use his automobile." To accept this explanation would stand the fourth amendment on its head. The police are not authorized to take away a person's liberty until the lack of probable cause is established. To the contrary, a person may only be detained where probable cause has already been shown. *See Gerstein,* 420 U.S. at 120 n. 21, 95 S.Ct. at 866 n. 21; *Mallory,* 354 U.S. at 456, 77 S.Ct. at 1360.

> [I]t must be concluded that if further investigation is needed after the arrest, the police have arrested without the requisite probable cause and the individual must be released. If "probable cause" is in doubt, the "investigation" must precede the arrest; anything less results in the serious infringement of the Fourth Amendment right to be secure in one's person.

*Dommer,* 427 F.Supp. at 1045.

■ Moreover, the officers cannot avail themselves of qualified immunity to escape liability for the acts in question. *Gerstein v. Pugh, supra,* decided in 1975, clearly established the constitutional standards the officers have here violated. The officers have not attempted to show that they could not reasonably have known of the *Gerstein* rule and therefore they may properly be charged with its knowledge. *See Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739. The officers should have known that their conduct in arresting and detaining a suspect for the length of time involved here without charging him, allowing him to post bond, and most importantly, without a judi-

cial determination of probable cause, would violate the Constitution. The clearly unacceptable reason given by the officers for the delay, as well as the fact that they were twice told by the prosecuting attorneys that there was insufficient evidence to further detain Llaguno, proves conclusively that they were not reasonable in believing that they could hold Llaguno for as long as they did without bringing him before a magistrate. Therefore, in view of the clearly established nature of the rights involved and the undisputed facts surrounding their conduct, qualified immunity is unavailable to the officers as a matter of law. We reverse the judgment of the district court on Count VII.

**V.**

Appellants' other contentions, including alleged errors in the giving of jury instructions and certain evidentiary rulings, are without merit. The errors, if any, are harmless and did not affect the substantial rights of the parties on the remaining accounts. *See* Fed.R.Civ.P. 61; *International Merger & Acquisition Consultants, Inc. v. Armac Enterprises, Inc.,* 531 F.2d 821, 823 (7th Cir.1976). We therefore affirm the judgment of the district court on Counts V, VIII, IX, and as to all the other appellants besides David Llaguno, Count IV. We reverse and remand for a new trial on the issue of damages on Counts I, II, III, VI, VII, and as to David Llaguno, Count IV.

PELL, Circuit Judge, concurring in part, dissenting in part.

I concur in that part of the majority opinion pertaining to the disposition of Counts IV, V, VIII, and IX and respectfully dissent from the reversal and remand for a new trial on damages only in Counts I, II, III, VI, and VII.

With hindsight, the majority opinion makes a persuasive argument for the plain-

---

14. The officers argue that Llaguno admitted that he had loaned the car to Luis Garcia and that he had been with Garcia and his brother, Roger Llaguno, on the day of the crimes. In effect, they are arguing that they had probable cause to hold David Llaguno.

tiffs having had their constitutional rights violated. The defendant policemen, however, in the performance of their duties to protect the public safety were not, and could not have been, possessed of even a garden variety of hindsight, let alone the detached, contemplative type provided in the appellate process. The circumstances of the evening as they reasonably could have seen them called for prompt and decisive action.

The situation with which they were confronted was that within a three hour period a robbery had been committed, four people had been murdered and others wounded, an eleven year old girl had been abducted, a gun battle with police had occurred and a vehicle involved in the evening's escapades which was registered to the Llaguno's address was in the vicinity where the occurrences had taken place. To characterize the violent crime spree as mad dog killers on the loose would not seem to be an overstatement. The record does not appear to me to be such as to be able to say with confidence that probable cause, or in any event exigent circumstances, as a matter of law did not exist. These questions, in my opinion, apparently shared by the district court judge who heard the witnesses, were properly questions for the jury.

If the jury was not properly instructed on the pertinent law, as the plaintiffs contend, then at the very least, the issues of probable cause and exigent circumstances should be presented to a jury under proper instructions in a new trial on the merits. Even lawyers, whether in practice or on the bench, have not in recent years been clear as to the exact factual limitations of probable cause and exigent circumstances. This court should be hesitant to typify the questions as having been concluded as a matter of law on the facts of this case.